**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF MARYLAND**

**NORTHERN DIVISION**

| | |
|---|---|
| IN RE:<br>TYSON FOODS INC., CHICKEN RAISED WITHOUT ANTIBIOTICS CONSUMER LITIGATION | Case No. 1:08-md-01982-RDB<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR FINAL APPROVAL OF  SETTLEMENT** |

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     MATERIAL TERMS OF THE PROPOSED SETTLEMENT ......................................... 2

        A.      Settlement Class........................................................................................ 2

        B.      Benefits For Class Members And Consumers ......................................... 2

        C.      Release ...................................................................................................... 4

III.    THE SETTLEMENT WARRANTS FINAL APPROVAL.......................................... 5

        A.      The Legal Standards for Settlement Approval.......................................... 5

        B.      The Settlement Is Fair .............................................................................. 6

                1.      The Posture of The Case at the Time Settlement Was Proposed............... 6

                2.      The Extent of Discovery That Was Conducted ......................................... 7

                3.      The Circumstances Surrounding the Negotiations ................................... 8

                4.      The Experience of Class Counsel In the Relevant Area ........................... 9

        C.      The Settlement Is Adequate .................................................................... 10

                1.      The Relative Strength of Plaintiffs' Case, Difficulties of Proof,
                        and Existence of Strong Defenses............................................................ 10

                2.      The Anticipated Duration and Expense of Additional Litigation............. 12

                3.      Tyson's Solvency and the Likelihood of Recovery.................................. 13

                4.      The Degree of Opposition to the Settlement............................................. 13

        D.      The Settlement Complies With Rule 23(e)........................................... 14

IV.     CONCLUSION...................................................................................................... 15

## TABLE OF AUTHORITIES

Cases                                                                    Page

*Amchem Prods., Inc. v. Windsor*
      521 U.S. 591 (1997)..................................................................................................... 12

*Evans v. Jeff D.*
      475 U.S. 717 (1986)....................................................................................................... 6

*Flinn v. FMC Group*
      528 F.2d 1169  (4th Cir. 1975) ..................................................................................... 6

*Hoffman v. First Student, Inc.*
      2010 WL 1176641 (D. Md. Mar. 23, 2010)......................................................... passim

*In re Jiffy Lube Sec. Litig.*
      927 F.2d 155 (4th Cir. 1991) .............................................................................. passim

*In re Mercedes-Benz Tele Aid Contract Litig.*
      2010 WL 931865 (D.N.J. Mar. 15, 2010)................................................................... 10

*In re MicroStrategy, Inc. Sec. Litig.*
      148 F. Supp. 2d 654 (E.D. Va. 2001) .............................................................. 6, 9, 13

*In re The Mills Corp. Sec. Litig.*
      2009 WL 5091931 (E.D. Va. Dec. 23, 2009) ................................................... 7, 9, 13

*Lomascolo v. Parsons Brinkerhoff, Inc.*
      2009 WL 3094955 (E.D. Va. Sept. 28, 2009).............................................................. 5

*Sanderson Farms, Inc. v. Tyson Foods, Inc.*
      547 F. Supp. 2d 491 (D. Md. 2008) ......................................................................... 10

*Vaughns v. Board of Educ. of Prince George's County*
      18 F. Supp. 2d 569 (D. Md. 1988) ............................................................................ 13

Statutes
28 U.S.C § 1715................................................................................................................... 14

I.       **INTRODUCTION**

On January 15, 2010, the Court granted preliminary approval of the proposed nationwide class action settlement in this case.  The settlement achieves the compensatory goals of the litigation by compensating consumers who purchased Tyson "Raised Without Antibiotics" products through a simple claim process.  The settlement achieves the deterrence goals of the litigation by requiring Tyson to pay $5 million in claims, administrative expenses and product donations, regardless of the number of claims submitted.  The settlement has been negotiated and presented to class members in compliance with Rule 23(e), has been favorably received by class members, and merits final approval.

The settlement was negotiated at arms' length over a period of many months by experienced counsel who were sufficiently familiar with the relevant facts and law to assess the strengths and weakness of the case and the relative benefits of settlement over trial and any appeals.  Notice has been given through a nationwide publication campaign, website postings and media outreach.  Class members have demonstrated their support for the settlement by submitting over 10,600 claims in three weeks, with three months still remaining in the claims period.  The claims administrator has reported no difficulties in the claims process, and there is no sign of any significant opposition to the settlement by consumers.  While some degree of opposition to any consumer class action settlement is customary, no objections have been received to date.

The proposed settlement allows any consumer who purchased Tyson chicken products during the relevant time period to receive up to $10 cash with no requirement of documentary proof by submitting a claim online and identifying the products purchased and the place and date the purchases were made.  A consumer who has retained receipts or obtains proof of purchase records from her grocer (available upon request through the computerized records maintained by "affinity" buying clubs) can receive up to

$50.  A consumer who simply affirms that she purchased any of the products at issue during the class period can obtain a coupon for five dollars off any Tyson product.  Tyson will donate the difference between the total claims paid out (in addition to any administrative expenses) and $5 million in Tyson product at wholesale cost to food banks around the United States.  The settlement reflects a favorable disposition of this consumer class action and merits final approval.

## II.   MATERIAL TERMS OF THE PROPOSED SETTLEMENT

### A.    Settlement Class

The proposed settlement covers the following class:  all persons who purchased Tyson chicken or chicken products sold in the United States as either "Raised Without Antibiotics" and/or "Raised Without Antibiotics That Impact Antibiotic Resistance in Humans" between June 19, 2007 and April 30, 2009.  (Settlement Agreement ¶ 1; Preliminary Approval Order ¶ 4.)

### B.    Benefits For Class Members And Consumers

Tyson must set aside $5 million to pay class member claims, costs of class notice and settlement administration, and any incentive awards the Court approves.  Class members are entitled to make claims based on their purchase of any "Covered Tyson Product."   If the total paid out is less than $5 million, Tyson will donate the difference in Tyson food products (at Tyson's wholesale cost) to food banks around the country.

Covered Tyson Products are defined as (i) fresh or frozen chicken, Cornish hens, or deli, bought between June 19, 2007 and April 30, 2009; and (ii) prepared chicken/value-added convenience chicken products (*e.g.*, "chicken tenders"), bought between November 1, 2007 and April 30, 2009.  (Settlement Agreement ¶ 13.B.)

Class members may elect one of three types of claims, which they may submit by either filling

out and mailing in a hard-copy claim form or completing an electronic form on the settlement website. Submission of an electronic claim can be completed in minutes.

*Tier 1 claims*.  Class members who submit a valid claim with proof of purchase of one or more Covered Tyson Products, in the form of a cash register receipt or similar contemporaneously generated documentation, are entitled to a refund of the actual purchase price, up to an aggregate amount of $50 per household.  (Settlement Agreement ¶ 13.C.)

*Tier 2 claims*.  In the alternative, class members may submit a claim without supporting documentation and stating, under penalty of perjury, (i) the estimated dollar amount of Covered Tyson Products they bought, (ii) the frequency of the purchases, (iii) the type of product bought, and (iv) the stores where the purchases were typically made.  Class members who submit valid Tier 2 claims are entitled to a refund of the actual purchase price, up to an aggregate amount of $10 per household.  Class members are allowed to submit a Tier 2 claim for some purchases and a Tier 1 claim for others. (Settlement Agreement ¶ 13.D-E.)

*Tier 3 claims*.  The third option for class members is to submit a claim for a coupon instead of cash.  Class members must submit a claim that includes their name and contact information and state, under penalty of perjury, that they bought Tyson RWA chicken at least once.  Class members who submit valid Tier 3 claims are entitled to a single coupon per household for up to $5 off any Tyson product.  Class members who make Tier 3 claims are not allowed to make Tier 1 or Tier 2 claims. (Settlement Agreement ¶ 13.F.)

If the sum of all valid class claims, notice and administration costs, and incentive awards is less than $5 million, Tyson must make in-kind donations of Tyson products to food banks in such amounts to bring its total payout to $5 million (excluding attorneys' fees and expenses).  If the sum of claims and

expenses exceeds $5 million, the compensation payable to claimants will be reduced to bring the sum down to that figure.  (Settlement Agreement ¶ 5.)

The mechanism for reducing claims is set forth in paragraph 13.H of the Settlement Agreement. In summary, 50 percent of the amount available for distribution will be allocated to pay Tier 1 claims; 25 percent to pay Tier 2 claims; and the remaining 25 percent to pay Tier 3 claims.  If any tier's allocation is insufficient to pay all valid claims in that tier, the amounts payable on those claims will be reduced pro rata.  If any tier's allocation exceeds the sum of all valid claims in that tier, the excess will be added to the allocation of the next tier below (*i.e.*, any remainder from the Tier 1 allocation will be added to the Tier 2 allocation, and any remainder from the Tier 2 allocation will be added to the Tier 3 allocation).  If any amount still remains after the "first pass" through the process, that amount will be used to recalculate any claims that were originally reduced, in this order of priority:  first, Tier 1 claims; then, Tier 2 claims.  (Settlement Agreement ¶ 13.H.)

## C.    Release

The settlement, and the judgment to be entered upon final settlement approval, will release claims that any Plaintiff or class member (including spouses, assigns, heirs, executors, etc.) may have against Tyson; any distributors, food service providers, or retailers who sold or supplied its RWA chicken; or any parent company, affiliate, subsidiary, successor, employee, director, etc. of any of these entities.  (Settlement Agreement ¶ 8.B.)  The released claims include all claims or causes of action arising from or relating to the claims that were or could have been asserted in the litigation; the facts or events alleged in the litigation; or any label, advertising, marketing, or other statements made to Plaintiffs or the class regarding Tyson's RWA representations.  (Settlement Agreement ¶ 8.C.)

III.    **THE SETTLEMENT WARRANTS FINAL APPROVAL**

A.      **The Legal Standards for Settlement Approval**

"There is a 'strong presumption in favor of finding a settlement fair.'" *Hoffman v. First Student, Inc.*, Civil No. WDQ-06-1882, 2010 WL 1176641, at *2 (D. Md. Mar. 23, 2010) (quoting *Lomascolo v. Parsons Brinkerhoff, Inc.*, No. 1:08cv131 (AJT/JFA), 2009 WL 3094955, at *10 (E.D. Va. Sept. 28, 2009)).  "Litigants should be encouraged to determine their respective rights between themselves and there is an overriding public interest in favor of settlement, particularly in class action suits." *Lomascolo*, 2009 WL 3094955, at *10.

The Fourth Circuit instructs that a class action settlement should be approved if it is both "fair" and "adequate."  *In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 158-59 (4th Cir. 1991).  The "fairness" evaluation centers on the settlement process.  A settlement is fair if it "was reached as a result of good-faith bargaining at arm's length, without collusion." *Id.* at 159.  In making this determination, a court should consider "(1) the posture of the case at the time settlement was proposed, (2) the extent of discovery that had been conducted, (3) the circumstances surrounding the negotiations, and (4) the experience of counsel in the area of … class action litigation." *Id.*

The "adequacy" evaluation is about substance of the settlement. *Id.*  In assessing the adequacy of a settlement, a court should consider: "(1) the relative strength of the plaintiffs' case on the merits, (2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial, (3) the anticipated duration and expense of additional litigation, (4) the solvency of the defendants and the likelihood of recovery on a litigated judgment, and (5) the degree of opposition to the settlement." *Id.*

In *Hoffman*, Judge Quarles of this District recently articulated a somewhat different, but not inconsistent, approach in approving a class action settlement.  Judge Quarles grouped the *Jiffy Lube* fairness and adequacy factors into a single test for "substantive fairness," and then examined the settlement's compliance with Rule 23(e) to determine "procedural fairness."  2010 WL 1176641, at *1-2.  Under *Hoffman*, a settlement passes the procedural fairness test if: (1) notice is given to the class in compliance with the court's order; (2) a hearing is held to determine whether the settlement is fair, reasonable, and adequate; (3) the parties have filed the statement setting forth their agreement; and (4) class members have an opportunity to object.  *Id*. at *1.

Plaintiffs address the *Jiffy Lube* considerations below, followed by a discussion of the *Hoffman* procedural fairness considerations.  "Ultimately, approval of a class action settlement is committed to 'the sound discretion of the district courts to appraise the reasonableness of particular class-action settlements on a case-by-case basis, in light of the relevant circumstances.'"  *In re MicroStrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d 654, 663 (E.D. Va. 2001) (quoting *Evans v. Jeff D.*, 475 U.S. 717, 742 (1986)).  Furthermore, "[b]ecause a settlement hearing is not a trial, the court's role is more 'balancing of likelihoods rather than an actual determination of the facts and law in passing upon … the proposed settlement.'"  *Hoffman* , 2010 WL 1176641 , at *2 (quoting *Flinn v. FMC Group*, 528 F.2d 1169, 1173 n.4 (4th Cir. 1975)).

### B.       The Settlement Is Fair

#### 1.       The Posture of The Case at the Time Settlement Was Proposed

The first consideration for whether a settlement is fair—whether it was reached through non-collusive, arm's-length negotiations—is the posture of the case at the time settlement was proposed. *Jiffy Lube*, 927 F.2d. at 159.  The settlement in this case was reached at a fairly advanced stage of the

proceedings, following substantial discovery and an opportunity for counsel to evaluate the issues and challenges in the litigation.

After the eight cases composing this multidistrict litigation were centralized before this Court, Plaintiffs filed a Master Amended Complaint to streamline discovery and class certification in the consolidated proceedings.  Tyson answered the complaint, settling the pleadings and defining the major issues for trial.  The parties proceeded with discovery and completed class-related discovery.  The Court held monthly status conferences and oversaw several discovery disputes.  Plaintiffs were preparing their class certification motion as they discussed settlement with Tyson.  On December 4, 2009, the business day preceding the deadline for Plaintiffs to file their motion for class certification, the parties notified the Court that they had reached a settlement in principle.  Plaintiffs' Joint Decl., ¶¶ 115-21.

Plaintiffs were therefore in a position to evaluate the issues they would face at class certification, summary judgment, and trial at the time the parties agreed to the settlement.  *See Hoffman*, 2010 WL 1176641, at *2 (finding that proceedings were sufficiently advanced where "shortly before this case was referred for settlement negotiations, the Court's decision on the cross-motions for summary judgment clarified the issues for trial"); *In re The Mills Corp. Sec. Litig.*, Civil Action no. 1:06-cv-00077, 2009 WL 5091931, at *8 (E.D. Va. Dec. 23, 2009) ("It is apparent to the Court that this settlement was not entered into haphazardly with an underdeveloped understanding of the merits of the case. … [T]he strengths and weaknesses of this case were well-developed for all parties, such that this factor also militates in favor of the Settlement.").

## 2.      The Extent of Discovery That Was Conducted

The next factor in the fairness analysis is the extent of discovery that was conducted before settlement.  *See Jiffy Lube*, 927 F.2d at 159.  Plaintiffs engaged in a significant amount of discovery and

fact investigation in this case.  Plaintiffs obtained nearly 450,000 pages of internal Tyson documents and nearly 200,000 pages of documents from other sources.  The parties exchanged nearly 100 written discovery requests and took fourteen depositions.  Plaintiffs reviewed and analyzed the discovery, hearing exhibits and testimony from the *Sanderson Farms* litigation.  Plaintiffs also obtained relevant documents from the U.S. Department of Agriculture through Freedom of Information Act requests, and subpoenaed materials from third parties such as Tyson's marketing agencies and retail customers.  Plaintiffs deposed six Tyson employees with key roles in the marketing and pricing of the RWA promotion.  Plaintiffs' Joint Decl., ¶¶ 35-38, 47-52, 54-63, 66-69, 71-73, 75-82, 84-90, 93-95, 98-103.  Having developed the facts to this degree, Plaintiffs were able to accurately assess the strengths and weaknesses of the case when negotiating the settlement.  *See, e.g., Hoffman*, 2010 WL1176641, at \*2 ("The record shows that … there has been extensive discovery, assuring sufficient development of the facts to permit an accurate assessment of the merits of the case.").

### 3.    The Circumstances Surrounding the Negotiations

The fairness inquiry next examines the circumstances surrounding the settlement negotiations.  *See Jiffy Lube*, 927 F.2d at 159.  The parties' negotiations in this case were adversarial and conducted at arms'-length, and took place while the parties were actively litigating the case.  As class discovery was closing in August 2009, the parties' previous intermittent settlement talks ripened into more determined negotiations.  Reaching an agreement in principle took approximately four months, during which the parties negotiated in person, by phone and through e-mail.  At several points, the parties appeared to be hopelessly deadlocked.  Plaintiffs' Joint Decl., ¶¶ 115-21.  The absence of collusion is also shown by the terms of the settlement itself.  As discussed more fully below, this case presented substantial risks, including the possibility that class certification would be denied or a favorable decision would be

reversed on appeal.  Under these circumstances, Plaintiffs obtained a settlement requiring Tyson to pay millions of dollars for the benefit of a nationwide class.

The comprehensive and arms'-length negotiations, as well as the terms of the settlement, confirm that there was no bad faith or collusion.  *See Mills Corp.*, 2009 WL 5091931, at *8 ("Negotiations were sufficiently thorough, contentious, and at arm's length to ensure the propriety of Class Counsel's decision to enter into the settlement and the proceedings leading thereto."); *MicroStrategy*, 148 F. Supp. 2d  at 664 ("[T]he posture of this case at the time the partial settlement was reached raises no concern that the settlement was reached in bad faith, was not the result of arm's length bargaining, or was a product of collusion among the Settling Parties.").

### 4.      The Experience of Class Counsel In the Relevant Area

The final consideration in the fairness evaluation is the experience of plaintiffs' counsel.  *See Jiffy Lube*, 927 F.2d at 159.  Class Counsel is competent and experienced in consumer class action litigation.  Compendium, Class Counsel Decls., Ex. 5.  In negotiating the settlement, Class Counsel assessed the factual and legal issues raised by Plaintiffs' claims and Tyson's defenses, and considered the substantial risks of continued litigation.  Class Counsel agreed to the settlement on behalf of the Settlement Class only after concluding that under the circumstances, the settlement provided substantial benefits to class members; was a fair, reasonable, and adequate compromise of their claims; and was in the best interests of the class as a whole.  Plaintiffs' Joint Decl., ¶¶ 129-33.  *See Mills Corp.*, 2009 WL5091931, at *9 ("In this case, Lead Counsel are highly experienced in the field of securities class action litigation. … Lead Counsel's decision to settle the case is the product of thorough exploration and deliberation and as such, 'their representations to the court that the settlement provides class relief which is fair, reasonable and adequate should be given significant weight.'").

C.     **The Settlement Is Adequate**

1.     **The Relative Strength of Plaintiffs' Case, Difficulties of Proof, and Existence of Strong Defenses**

In *Jiffy Lube*, the first two considerations in the adequacy analysis are "(1) the relative strength of the plaintiffs' case on the merits," and "(2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial."  927 F.2d at 159.  Because these factors are related, Plaintiffs address them together.

After many months of preparing for class certification and exchanging views with Tyson's counsel during settlement negotiations, Plaintiffs developed a comprehensive assessment of the various issues in this case.  This Court's ruling in the case filed by Tyson's competitors, *Sanderson Farms, Inc. v. Tyson Foods, Inc.*, Civ. No. RDB-08-210, 547 F. Supp. 2d 491 (D. Md. 2008), goes a long way toward establishing the merits of Plaintiffs' claim that Tyson's RWA labels were false and misleading, albeit at the preliminary injunction stage of that litigation.  In assessing the settlement value of the case, however, Plaintiffs necessarily considered the procedural hurdles—particularly relating to the manageability of litigating on a class-wide basis—that plaintiffs face when seeking to certify a class of consumers who allege that they have been deceived by a company's advertising and product labels.

One consistent challenge in nationwide class action litigation is choice of law.  Plaintiffs were seeking to apply the law of Tyson's home state, Arkansas, to the claims of all class members.  Although courts do certify nationwide classes by applying the law of the defendant's home state to all claims, *see, e.g., In re Mercedes-Benz Tele Aid Contract Litig.*, MDL No. 1914, 2010 WL 931865 (D.N.J. Mar. 15, 2010), Tyson could cite numerous decisions to the contrary.  Courts often conclude that applying the law of more than one state to class claims raises insurmountable manageability issues that preclude certification of a litigation class.

Another consideration is whether Plaintiffs would be able to prove damages on aggregate basis. Tyson took the position that Plaintiffs must prove damages on an individualized basis. If Tyson's position were to prevail, each class member would be required to show proof of purchase, as well as the additional amount that he or she spent for the chicken because it was labeled as RWA—in other words, the "premium" he or she paid. Tyson contends that the "premium" amount was not readily ascertainable or consistent from store to store, from product to product, or throughout the class period. In other words, the premium amount paid by a class member who purchased a Tyson product in November 2007 at Store A could be different than the premium amount paid by a class member who purchased another Tyson product at Store B in April 2008. The related difficulty, which the Court acknowledged at the preliminary approval hearing, is that class members may not have saved receipts for run-of-the-mill grocery purchases that included the RWA chicken.

Plaintiffs took steps early in the case to identify, preserve and obtain data from Tyson's retail clients relating to premiums and identification of class members who suffered damages. But the various supermarket chains that sold Tyson's RWA chicken save different types of information in different configurations with different levels of accessibility. These proof issues therefore present a challenge for both class certification and any post-judgment distribution of damages. Any further delay of litigation, including an inevitable Rule 23(f) appeal of class certification, would only exacerbate the problem.

Challenges exist even if Plaintiffs were able to prove class-wide damages on an aggregate basis. Expert analysis of the complex supermarket data would be required, as well as a response to Tyson's contention that most or all of the premium was due to other factors like increased feed and energy costs or the company's new "Trimmed and Ready" line. Moreover, Tyson has consistently offered evidence

that the RWA program was not a success, so any damages theory that turns on Tyson's ill-gotten gains could achieve a minimal result for the class.

This settlement avoids these manageability problems.  *See, e.g., Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997) ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial.") (internal citation omitted).  Class members identify themselves by participating in the settlement on an opt-in basis.  The comprehensive notice program has effectively reached class members, and more than 10,600 have filed claims in three weeks, with three months still remaining to file claims.  The process for filing a claim is easy and consumer-friendly.  A class member can submit a claim on the settlement website by filling out a short online form.  A class member who has retained receipts for his or her purchases, or who takes the minimal steps required to obtain receipts from their grocer, may submit the receipts online or through the mail to receive a higher payment.  The claims are not limited to any RWA premium paid for Tyson chicken; class members may make claims for the full purchase price, up to a total payment of $50 or $10 per household, depending on the level of proof.

### 2.  The Anticipated Duration and Expense of Additional Litigation

In determining adequacy, the Court should also consider the anticipated duration and expense of continued litigation.  *See Jiffy Lube*, 927 F.2d at 159.  Prosecuting this case to an outcome on the merits threatened to be a time-consuming and costly proposition.  The major stages in this case remaining before trial—class certification and summary judgment—would undoubtedly entail protracted, fiercely contested proceedings, as would the trial itself and any ensuing appeals.  Extensive expert testimony regarding both the propriety of class certification and the economic issues raised by the case would be

required.  *See Mills Corp.*, 2009 WL 5091931, at *10 ("It goes without much debate that any future proceedings leading up to, and including trial would be just as antagonistic and expensive, and lengthy post-trial motions likely would be filed."); *MicroStrategy*, 148 F. Supp. 2d at 667 ("[A]dditional litigation of plaintiffs' claims … would likely have been protracted and costly, requiring extensive expert testimony …. Nor is it likely that this litigation would have ended with a jury verdict; there is little doubt that a jury verdict for either side would only have ushered in a new round of litigation in the Fourth Circuit and beyond, thus extending the duration of the case and significantly delaying any relief for plaintiffs.").  The risk, expense and delay associated with a trial must be weighed in relation to the certain recovery available through settlement.

### 3.      Tyson's Solvency and the Likelihood of Recovery

Another consideration in the adequacy analysis is defendant's solvency and the likelihood of recovery on a litigated judgment.  *See Jiffy Lube*, 927 F.2d at 159.  This factor plays a neutral role here, as Plaintiffs believe that Tyson is solvent and able to pay a judgment.

### 4.      The Degree of Opposition to the Settlement

The final consideration is the level of class member opposition to the settlement.  *See Jiffy Lube*, 927 F.2d at 159.  Some opposition is to be expected in a consumer class action settlement.  As of the date of this filing, however, no class member has objected or sought to be excluded from the class. Many class members have submitted claims, and the July 6, 2010 claim deadline is still three months away.  Plaintiffs' Joint Decl., ¶¶ 124-28.  *See Hoffman*, 2010 WL 1176641, at *2 (granting approval where "no class member has objected to the proposed settlement and the parties' counsel attest to the fairness of this proposal in their joint motion to approve the class-wide settlement") (footnote omitted); *Vaughns v. Board of Educ. of Prince George's County*, 18 F. Supp. 2d 569, 580 (D. Md. 1988)

(approving settlement where only "a very limited degree of opposition to the settlement has been voiced by class members").

While the time period for filing objections has not run, if any class members do object, Class Counsel will respond in papers to be filed on April 30, 2010.  Notice of the settlement was sent to the appropriate state and federal officials pursuant to the Class Action Fairness Act, 28 U.S.C § 1715.  (*See* Dkt. No. 98.)  As of the date of this filing, no state or federal official has objected to the settlement.

### D.      The Settlement Complies With Rule 23(e)

Each of the *Hoffman* factors for procedural fairness is also satisfied.  *See Hoffman*, 2010 WL 1176641, at *1-2.

First, notice has been provided to settlement class members in accordance with the Preliminary Approval Order.  The notice plan approved by the Court included nationwide publication of a summary notice; establishment and maintenance of a dedicated settlement website; the running of "clickable" Internet banner advertisements that took the viewer to the settlement website; and extensive media outreach.  (*See* Settlement Agreement, Ex. D (notice plan); Preliminary Approval Order ¶ 7 (approving plan).)  The Settlement Administrator has implemented the plan as ordered by the Court.  *See* Declaration of Jennifer M. Keough.

Second, the Court will hold a public hearing on May 7, 2010 to determine whether the settlement is fair, reasonable, and adequate.

Third, the parties have filed the Settlement Agreement and all of its exhibits, which together set forth the proposed settlement.

Fourth, the Court has provided class members with an opportunity to oppose or exclude themselves from the settlement, with an objection and exclusion deadline of April 19, 2010.

(Preliminary Approval Order ¶¶ 8-9.)  This deadline and the procedures for objecting or opting out were described in the published notice and are included in the long-form notice that is posted on the settlement website, (Settlement Agreement, Exs. E-F).  They are also summarized in the text of the settlement website, www.ChickenSettlement.com.

IV.   **CONCLUSION**

Because the proposed settlement is fair, adequate and complies with Rule 23(e), Plaintiffs request that the Court grant final approval and enter the parties' proposed Final Judgment and Order.

Dated:  April 9, 2010                       Respectfully submitted,

                                            By:    /s/ *James P. Ulwick*

                                            James P. Ulwick
                                            KRAMON & GRAHAM, P.A.
                                            One South Street, Suite 2600
                                            Baltimore, Maryland 21202
                                            Telephone:  (410) 752-6030
                                            Facsimile:  (410) 539-1269

                                            Daniel C. Girard
                                            A. J. De Bartolomeo
                                            Amanda M. Steiner
                                            Christina H.C. Sharp
                                            GIRARD GIBBS LLP
                                            601 California Street, Suite 1400
                                            San Francisco, California 94108
                                            Telephone:  (415) 981-4800
                                            Facsimile:  (415) 981-4846

                                            Scott E. Poynter
                                            Chris D. Jennings
                                            Gina M. Dougherty
                                            EMERSON POYNTER LLP
                                            The Museum Center
                                            500 President Clinton Avenue, Suite 305
                                            Little Rock, Arkansas 72201
                                            Telephone:  (501) 907-2555
                                            Facsimile:  (501) 907-2556

Richard S. Lewis
James J. Pizzirusso
HAUSFELD, LLP
1700 K St., NW, Suite 650
Washington, DC 20006
Telephone:  (202) 540-7200
Facsimile:  (202) 540-7201

Gary Friedman
Tracey Kitzman
FRIEDMAN LAW GROUP LLP
270 Lafayette Street, 14th Floor
New York, New York 10012
Telephone:  (212) 680-5150
Facsimile:  (646) 277-1151

*Settlement Class Counsel*