**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF MARYLAND**

**NORTHERN DIVISION**

| | |
|---|---|
| IN RE:<br>TYSON FOODS INC., CHICKEN RAISED<br>WITHOUT ANTIBIOTICS CONSUMER<br>LITIGATION | Case No. 1:08-md-01982-RDB<br><br>**PLAINTIFFS' RESPONSE TO<br>OBJECTIONS AND FURTHER<br>REPORT ON REACTION OF THE<br>CLASS** |

## TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................................... 1

II.     THE LACK OF MEANINGFUL OBJECTION DEMONSTRATES THAT
        CLASS MEMBERS ARE SATISFIED WITH THE SETTLEMENT ............................... 2

III.    THE NOTICE PLAN MET THE REQUIREMENTS OF DUE PROCESS ..................... 4

IV.     NONE OF THE OBJECTIONS REFUTES THE COURT'S PRELIMINARY
        FINDING THAT THE SETTLEMENT IS FAIR, REASONABLE AND
        ADEQUATE .................................................................................................................... 7

        A.      The Settlement Provides Meaningful Relief, Particularly Given the Risks
                of Continued Litigation ......................................................................................... 7

                1.      The Coupon Component of the Settlement Allows Class Members
                        to Benefit Even Though They Have No Proof of Their Damages .............. 9

                2.      The Donations to Food Banks Are the "Next Best Use" of
                        Unclaimed Funds ..................................................................................... 11

        B.      The Class Is Properly Defined ............................................................................ 13

        C.      The Scope of the Release Is Commensurate With the Claims Asserted ............... 14

V.      THE ATTORNEYS' FEE REQUEST IS REASONABLE ............................................. 16

        A.      The Negotiating Process Resulted in a Reasonable Fee ....................................... 16

        B.      A Lodestar Analysis Confirms That the Requested Fee Is Reasonable ................ 18

        C.      There Is No Reason to Delay Payment of Attorneys' Fees .................................. 22

VI.     THE INCENTIVE PAYMENTS ARE APPROPRIATE ................................................. 23

VII.    CONCLUSION ............................................................................................................. 25

## TABLE OF AUTHORITIES

**Cases**                                                     **Page**

*Amchem Prods., Inc. v. Windsor*
521 U.S. 591 (1997) ................................................................................................ 17

*Bell Atl. Corp. v. Bolger*
2 F.3d 1304 (3d Cir.1993) ......................................................................................... 3

*Browning v. YahooA, Inc.*
2007 WL 4105971 (N.D. Cal. Nov. 16, 2007) ................................................ 23

*DeHoyos v. Allstate Corp.*
240 F.R.D. 269 (W.D. Tex. 2007) ........................................................... passim

*Duhaime v. John Hancock Mut. Life Ins. Co.*
989 F. Supp. 375 (D. Mass. 1997) .................................................................... 17

*Flinn v. FMC Group*
528 F.2d 1169 (4th Cir. 1975) ........................................................................... 25

*Grays Harbor Adventist Christian School v. Carrier Corp.*
2008 WL 1901988 (W.D. Wash. Apr. 24, 2008) ............................................ 23

*Hanlon v. Chrysler Corp.*
150 F.3d 1011 (9th Cir. 1998) ............................................................................. 7

*Hoffman v. First Student, Inc.*
2010 WL 1176641 (D. Md. Mar. 23, 2010) ..................................................... 24

*In re American Honda Motor Co., Inc. Dealers Relations Litig.*
979 F. Supp. 365 (D. Md. 1997) ....................................................................... 20

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*
370 F. Supp. 2d 320 (D. Me. 2005) ................................................................. 22

*In re Computron Software, Inc.*
6 F. Supp. 2d 313 (D.N.J. 1998) ...................................................................... 21

*In re Excess Value Ins. Coverage Litig.*
598 F. Supp. 2d 380 (S.D.N.Y. 2005) .............................................................. 22

*In re General American Life Ins. Co. Sales Practices Litig.*
357 F.3d 800 (8th Cir. 2004) ............................................................................ 16

*In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*
55 F.3d 768 (3d Cir. 1995) ............................................................................ 9, 10

*In re Initial Public Offering Sec. Litig.*
671 F. Supp. 2d 467 (S.D.N.Y. 2009) .............................................................. 21

*In re Lease Oil Antitrust Litig. (No. II)*
2009 WL 5195977 (S.D. Tex. Dec. 22, 2009) ................................................ 11

*In re Mercedes-Benz Tele Aid Contract Litig.*
2010 WL 931865 (D.N.J. Mar. 15, 2010) ........................................................ 20

*In re Mexico Money Transfer Litig.*
164 F. Supp. 2d 1002 (N.D. Ill. 2000) ............................................................ 10

*In re Microsoft Corp. Antitrust Litig.*
185 F. Supp. 2d 519 (D. Md. 2002) ................................................................ 11

*In re NTL Inc. Sec. Litig.*
2007 WL 1294377 (S.D.N.Y. 2007) .............................................................. 20

*In re Pharmaceutical Industry Average Wholesale Price Litig.*
588 F.3d 24 (1st Cir. 2009) ............................................................................ 11

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*
148 F.3d 283 (3d Cir. 1998) ........................................................................... 20

*In re Serzone Prods. Liab. Litig.*
231 F.R.D. 221 (S.D. W. Va. 2005) ................................................................. 5

*In re Sony SXRD Rear Projection Television Class Action Litig.*
2008 WL 1956267 (S.D.N.Y. May 1, 2008) .................................................. 17

*In re TFT-LCD (Flat Panel) Antitrust Litig.*
2010 WL 1417896 (N.D. Cal. March 28, 2010) ............................................ 20

*In re Wal-Mart Wage & Hour Empl. Pract. Litig.*
2010 WL 786513 (D. Nev. Mar. 8, 2010) ........................................................ 3

*In re Warfarin Sodium Antitrust Litig.*
391 F.3d 516 (3d Cir. 2004) ............................................................................. 5

*In re Western Union Money Transfer Litig.*
2004 WL 3709932 (E.D.N.Y. Oct. 19, 2004) ....................................... 9, 10, 24

*Jefferson v. Chase Home Finance*
2009 WL 2051424 (N.D. Cal. 2009) .............................................................. 21

*Jones v. Dominion Resources Services, Inc.*
601 F. Supp. 2d 756 (S.D. W. Va. 2009) ............................................19, 20, 23, 24

*Lipuma v. American Express Co.*
406 F. Supp. 2d 1298 (S.D. Fla. 2005) .......................................................... 16

*Lobatz v. U.S. West Cellular of California, Inc.*
222 F.3d 1142 (9th Cir. 2000) ....................................................................... 18

*Lubitz v. DaimlerChrysler Corp.*
2006 WL 3780789 (N.J. Super. Dec. 21, 2006) ............................................... 3

*Lund v. AT&T Corp.*
Case No. C 98-1500-DDP (C.D. Cal. Oct. 15, 1998) ..................................... 20

*Malchman v. Davis*
761 F.2d 893 (2d Cir. 1985), *cert. denied*, 475 U.S. 1143 (1986) .................... 16

*Masters v. Wilhelmina Model Agency, Inc.*
  473 F.3d 423 (2d Cir. 2007) ............................................................................... 11

*McBean v. City of New York*
  233 F.R.D. 377 (S.D.N.Y. 2006) .......................................................................... 25

*McCoy v. Health Net, Inc.*
  569 F. Supp. 2d 448 (D.N.J. 2008) ........................................................................ 3

*National Super Spuds, Inc. v. New York Mercantile Exchange*
  660 F.2d 9 (2d Cir. 1981) ................................................................................... 15

*Odom v. Microsoft, et al.*
  Case No. 04-2-10618-4-SEA (Wash. Sup. Ct., King Cty. April 4, 2007) ...................... 20

*Officers for Justice v. Civil Serv. Comm'n*
  688 F.2d 615 (9th Cir. 1982) ................................................................................ 2

*Parkinson v. Hyundai Motor America*
  258 F.R.D. 580 (C.D. Cal. 2008) ......................................................................... 20

*Pelletz v. Weyerhaeuser Co.*
  255 F.R.D. 537 (W.D. Wash. 2009) ....................................................................... 7

*Pelletz v. Weyerhaeuser Co.*
  592 F. Supp. 2d 1322 (W.D. Wash. 2009) .............................................................. 19

*Robinson v. Equifax Information Servs., LLC*
  560 F.3d 235 (4th Cir. 2009) .............................................................................. 20

*Rodriguez v. West Publ'g Corp.*
  563 F.3d 948 (9th Cir. Cal. 2009) .................................................................... 23, 25

*Smith v. Krispy Kreme Doughnut Corp.*
  2007 WL 119157 (M.D.N.C. Jan. 10, 2007) ........................................................... 24

*Staton v. Boeing Co.*
  327 F.3d 938 (9th Cir. 2003) .............................................................................. 25

*Stoetzner v. U.S. Steel Corp.*
  897 F.2d 115 (3d Cir. 1990) ................................................................................. 3

*Vaughns v. Board of Educ. of Prince George's County*
  18 F. Supp. 2d 569 (D. Md. 1988) ......................................................................... 2

*Vista Healthplan, Inc. v. Warner Holdings Co. III, Ltd.*
  246 F.R.D. 349 (D.D.C. 2007) ............................................................................ 21

*Wal-Mart Stores Inc. v. Visa U.S.A., Inc.*
  396 F.3d 96 (2d Cir. 2005) .................................................................................. 15

*Weber v. Gov't Employees Ins. Co.*
  262 F.R.D. 431 (D.N.J. 2009) ............................................................................. 19

*Wells v. Allstate Ins. Co.*
    557 F. Supp. 2d 1 (D.D.C. 2008)................................................................................21, 24

*Yarrington v. Solvay Pharm., Inc.*
    2010 WL 1006518 (D. Minn. Mar. 16, 2010) ............................................................ 3, 21

*Yeagley v. Wells Fargo & Co.*
    2008 WL 171083 (N.D. Cal. Jan. 18, 2008) ................................................................. 22

## Other Authorities

Fed. R. Civ. P. 23(e)(1)....................................................................................................... 5

Manual for Complex Litigation (Fourth)...........................................................................6

Newberg on Class Actions (4th ed. 2009) ..................................................... 11, 12, 17

I.    **INTRODUCTION**

Response to the settlement the Court preliminarily approved on January 15, 2010, has been overwhelmingly positive.  Class members have been steadily accessing the dedicated website, www.ChickenSettlement.com, and filing claims online.  Already, some 12,100 claims have been received, with more than two months remaining in the claims period.  Over 85% of the claimants seek cash payments, with the remainder opting to receive a coupon instead.

The decision of these class members to participate confirms the success of the settlement, particularly when contrasted with the fact that only two class members have opted out.  A mere five objections were timely filed.  The objections were filed by:

- Lisa F. Estep and Robert A. Falkner, represented by Edward Siegel and Edward Cochran;

- Sallie Turner and Jennifer Horrell, represented by Jeffrey Weinstein;

- Shelagh Needham-Ward, represented by Steve Miller;

- Sara Sibley, M.D.; and

- Thomas L. Cox, Jr.

The objectors make generalized challenges to the notice plan, settlements that include coupons as part of the relief, the amount of attorneys' fees, and the incentive payments to the named plaintiffs.[1]  They do not acknowledge or take into account the claims and defenses at issue in this litigation, offer any alternative claims, theories or strategies that might have yielded a more favorable result for the class, or propose more effective ways of cost-effectively soliciting claims and distributing benefits in a consumer class action like this one.

The purpose of the final approval hearing is not to allow others to attempt to rework the details of a settlement that is the result of long, complex and hard-fought negotiations, or to judge the settlement against a "hypothetical or speculative measure of what might have been

---

[1]  Plaintiffs do not contest the standing of any objectors based on their written submissions but reserve the right to seek discovery concerning their membership in the class.

1

achieved." *See Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982). None of the objections raises concerns that should disturb the Court's preliminary finding that the settlement is fair, reasonable and adequate. Plaintiffs therefore request that the Court approve the settlement, fee award and incentive payments, and enter the revised proposed final judgment.

## II.    THE LACK OF MEANINGFUL OBJECTION DEMONSTRATES THAT CLASS MEMBERS ARE SATISFIED WITH THE SETTLEMENT

There has been a considerable and positive response to the settlement by class members. As of April 29, 2010, the Settlement Administrator has received 1,469 telephone calls to the 1-800 number, 1,184 of which have received live support. In addition, the Settlement Administrator has received 436 letters, all of which were non-substantive requests for copies of the notice or claim forms issued in connection with the settlement. The www.ChickenSettlement.com website has experienced 50,489 visits. More than 12,000 class members have filed claims. Most of the claims (89.75%) have been filed online. The vast majority of class members (85%) have filed Tier 2 claims, while approximately 3% of class members have filed Tier 1 claims and 12% have filed Tier 3 claims. The deadline to file claims is still more than two months away, closing on July 6, 2010. *See* Keogh Response Decl., ¶ 2.

By contrast, only two class members requested to be excluded from the settlement. *See* Keogh Response Decl., ¶ 3. Five timely objections were filed.[2] This minimal opposition to the terms of the settlement—particularly where so many class members have chosen to participate— strongly supports final approval of the settlement. *See, e.g., Vaughns v. Board of Educ. of Prince George's County*, 18 F. Supp. 2d 569, 580 (D. Md. 1988) (approving settlement where only "a

---

[2] Additional, but untimely, objections were submitted by Ruth Valencia (Dkt. No. 113) and Jill Hendle (Dkt. No. 114). Class Counsel has made multiple efforts to contact both Ms. Valencia and Ms. Hendle to explain the claims process. *See* De Bartolomeo Response Decl., ¶¶ 3-6. Class Counsel has discussed the claims options and process with Ms. Hendle, who has stated that she plans to file a claim. Class Counsel will follow up to ensure that Ms. Hendle timely files her claim. *Id.* at ¶¶ 4-5. Although efforts to reach Ms. Valencia have thus far been unavailing, Class Counsel will continue to attempt to reach her. *Id*. at ¶ 6.

very limited degree of opposition to the settlement has been voiced by class members"); *see also Bell Atl. Corp. v. Bolger,* 2 F.3d 1304, 1313 (3d Cir.1993) (finding that less than 30 objectors in a class of 1.1 million is an "infinitesimal number"); *Stoetzner v. U.S. Steel Corp.,* 897 F.2d 115, 118-19 (3d Cir. 1990) (29 objections in 281 member class "strongly favors settlement").

Most of the objections appear to be lawyer-driven, with several filed by individuals represented by attorneys—Edward Siegel, Edward Cochran, Jeffrey Weinstein—who have been recognized as "professional objectors" by other courts. *See, e.g.*, *Yarrington v. Solvay Pharm., Inc.*, No. 09-CV-2261, 2010 WL 1006518, at *12 n.1 (D. Minn. Mar. 16, 2010) ("Mr. Siegel is known to the Court as a frequent objector."); *In re Wal-Mart Wage & Hour Empl. Pract. Litig.*, No. 2:06-CV-00225-PMP-PAL, 2010 WL 786513, at *1 (D. Nev. Mar. 8, 2010) (ordering objectors to post appeal bonds and observing that objectors' counsel, including Mr. Siegel and Mr. Cochran, "have a documented history of filing notices of appeal from orders approving other class action settlements, and thereafter dismissing said appeals when they and their clients were compensated by the settling class or counsel for the settling class"); *McCoy v. Health Net, Inc.*, 569 F. Supp. 2d 448, 472-73 (D.N.J. 2008) ("None of the Weinstein objections sets forth a basis to set aside or modify the Settlement," including challenges to the fee award and incentive payments); *Lubitz v. DaimlerChrysler Corp.*, 2006 WL 3780789, at *15 (N.J. Super. Dec. 21, 2006) (rejecting objections of class member represented by Mr. Weinstein and observing, "There is always a 'better' settlement just around the corner, but without a principled way to reject the instant compromise other than to nitpick it to death, there is no just reason to disturb the efforts of those who toiled so long and hard to reach a reasonable accommodation of all parties' interests.").

Steve Miller is also no stranger to objecting to class settlements. He has filed objections in other cases that make arguments very similar to those he makes here. *See* De Bartolomeo Response Decl., Exs. B and C. And although objector Thomas L. Cox, Jr. does not identify

himself as an attorney, he appears to have practiced law in Texas since 1974.  De Bartolomeo

Response Decl., Ex. D.  Mr. Cox's law partner, Gary Warren Sibley, is likely related to objector

Sara Sibley, whose objection is very similar, and in many respects identical, to Mr. Cox's.

De Bartolomeo Response Decl., Ex. E.

The substance of the objections is addressed below.

**III.    THE NOTICE PLAN MET THE REQUIREMENTS OF DUE PROCESS**

The Court approved the notice program at the preliminary approval hearing, and

observed that it was "very well done and advised."  *See* Transcript of Preliminary Approval

Hearing (Dkt. No. 97 at 15:23).  The notice program included publication in the February 28,

2010 edition of *Parade* and the March 8, 2010 issue of *People*.  *See* Keough Decl., ¶ 3 & Ex. A

(Dkt. No. 103).  These two publications have a combined circulation of more than 36 million;

*People* also reports one of the largest "pass-along rates" of any magazine, which increases its

readership by more than 39 million.  *See* Ulwick Decl., Ex. 1 at Ex. D (Dkt. No. 94).  A press

release over *PR Newswire's* US-1 network reached more than 7,800 media outlets, including

newspapers, websites, magazines, national wire services, television and radio broadcast media,

online databases and internet networks.  A press release in Spanish was also issued through *PR

Newswire's* Hispanic Newsline.  *See* Keough Decl., ¶ 4 (Dkt. No. 103); Ulwick Decl., Ex. 1 at

Ex. D (Dkt. No. 94).  Banner ads appeared on numerous internet sites, including *Weather.com*,

*CNN.com*, and *Parenting.com*, as well as over 400 local newspapers and television websites

across the U.S., which together were expected to reach over 9.6 million viewers.  *See* Keough

Decl., ¶ 5 (Dkt. No. 103); Ulwick Decl., Ex. 1 at Ex. D (Dkt. No. 94).

The newspaper ads, press releases and banner ads all directed class members to the

website dedicated to the settlement, www.ChickenSettlement.com.  Visitors to the website can

download more information about the settlement, including a notice packet, the complaint, the

Court's preliminary approval order and the settlement agreement.  Class members may also file a

claim entirely online through the website.  *See* Keough Decl., ¶ 6 (Dkt. No. 103).  Viewers of the ads and press releases may also call an automated toll-free number (1-800-949-1890), accessible 24 hours a day, seven days a week, to request a notice packet or a return call.  *See* Keough Decl., ¶ 7 (Dkt. No. 103).

This extensive notice program satisfies the requirement of "direct[ing] notice in a reasonable manner to all class members who would be bound by the proposal."  Fed. R. Civ. P. 23(e)(1).  No objectors have pointed out any way of putting notice directly in the hands of class members, and courts widely recognize that when class members cannot be identified through reasonable effort, notice by publication can constitute the best practical notice.  *See, e.g., In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 536 (3d Cir. 2004) ("The District Court determined that this requirement [of notice under Rule 23(c)(2)] was satisfied by publishing summary notice in publications likely to be read by consumer claimants along with a call-center and a website with information and downloadable forms."); *In re Serzone Prods. Liab. Litig.*, 231 F.R.D. 221, 231-32, 235-37 (S.D. W. Va. 2005) (approving settlement and rejecting objections to notice plan, where vast majority of 8 million class members were given notice by publication).

Objector Cox characterizes the notice plan as "little more than notice by word of mouth," and says that the notices in *Parade* and *People* were unlikely to reach many class members.  Objector Sibley echoes these statements, and further challenges the placement of "unknown, unnamed internet banner ads."  Cox at 2; Sibley at 2.  The detailed notice plan, which was attached as Exhibit D to the Settlement Agreement filed with Plaintiffs' preliminary approval papers, shows that the program was designed to reach as many Tyson chicken brand consumers as possible, based in part on information from independent media research firm Mediamark Research and Intelligence, LLC.  The notice plan also identifies all of the newspapers that carry *Parade*, the websites on which banner ads were posted, and the media outlets that received the

press release.  Ulwick Decl., Ex. 1 at Ex. D (Dkt. No. 94).  All indications are that this notice program was remarkably successful.  *See DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 298 (W.D. Tex. 2007) ("In fact, an argument can be made the objectors' knowledge of the settlement and their submission of objections according to the terms of the notice illustrates the effectiveness of the notice program used in this case.").

Objector Sibley says that notice of the settlement should have been posted in all stores that sell Tyson chicken.  Posting notice in stores is not a workable suggestion.  The parties to the Settlement Agreement have no control over what is made available to consumers at the point of purchase, or the authority to require supermarkets to post any class notice.  For example, Tyson makes point of sale materials available to retailers for use in their stores, but it is up to retailers to decide for themselves whether to use these materials.  Supermarkets may have any number of reasons for declining to post class notice in an area containing Tyson products, such as aversion to litigation, sensitivity about unnecessary clutter, concern for the aesthetics of their displays, or difficulties arising from questions the posting might prompt.  "The objectors have not shown such a task would not be unduly burdensome or unnecessary."  *DeHoyos*, 240 F.R.D. at 297.

Finally, Objector Cox says that the notice should be posted on Tyson's website with a link to the settlement website.  It is unlikely that class members would look to Tyson's website for this type of information when all of the forms of notice provide the internet address for the settlement website, www.ChickenSettlement.com.  The strained objections raised by Sibley and Cox serve only to underscore the adequacy of the notice program implemented by the parties.

The content of the notice complied with Rule 23(c)(2), as well as the additional items suggested by the *Manual for Complex Litigation (Fourth)* § 21.312.  Objector Cox says that the notice should also have included a list of the locations where Tyson RWA chicken was sold and a reproduction of the label.  Adding either of these types of information to the notice would have only made it confusing and unwieldy.  The Tyson RWA chicken was sold in tens of thousands of

stores across the country through a number of retail chains.  The settlement also covers
approximately 300 different products, which carry a variety of labels.  Consumers would derive
no benefit from having to consult a long list of retailers before filing a claim, when they can file
an online claim in seconds relying only on their good faith recollection.

The objectors provide no reason to disturb the Court's finding that the notice plan
provided the best practicable notice under the circumstances.

## IV.     NONE OF THE OBJECTIONS REFUTES THE COURT'S PRELIMINARY FINDING THAT THE SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE

### A.     The Settlement Provides Meaningful Relief, Particularly Given the Risks of Continued Litigation

None of the objections to the settlement's substantive terms presents a convincing reason
why the settlement should not be granted final approval.  "[A]n individual who objects has a
heavy burden of demonstrating that the settlement is unreasonable."  *DeHoyos*, 240 F.R.D. at
293 (citation omitted).  "[T]he Court's inquiry 'is not whether the final product could be prettier,
smarter or snazzier, but whether it is fair, adequate and free from collusion.'"  *Pelletz v.
Weyerhauser Co.*, 255 F.R.D. 537, 544 (W.D. Wash. 2009) (quoting *Hanlon v. Chrysler Corp.*,
150 F.3d 1011, 1027 (9th Cir. 1998)).

The settlement allows all purchasers of Tyson's RWA chicken to participate and benefit,
even if they did not retain proof of their purchases and cannot (or choose not to) retrieve
documentation from another source, such as the electronic records maintained by most "affinity"
buying clubs.  Class members who submit receipts will receive up to $50 (Tier 1),[3] while those
who state the estimated amount, frequency, type and stores of their purchases but do not have
receipts will receive up to $10 (Tier 2).  If appropriate, class members may submit both Tier 1

---

[3] Objector Needham-Ward and the Siegel/Cochran objectors assert that 50% of the funds are "set
aside" for payment of Tier 1 claims, but that is only the case if the amount of claims submitted in
all Tiers exceeds the total settlement fund.  (Settlement Agreement, ¶ 13.H.)

and Tier 2 claims.  Finally, class members who do not recall any of the details of their purchases may submit a claim for a $5 coupon off any Tyson product (not just chicken).  *See* Ulwick Decl., Ex. 1 (Settlement Agreement) at ¶ 13 (Dkt. No. 94).

The objectors argue that the settlement is really a "coupon settlement" because very few customers will have receipts for their chicken purchases or the information needed to file a Tier 2 claim for $10.  (Siegel/Cochran at 2-3; Needham-Ward at 2-3; Sibley at 2-3; Cox at 4.)  The claims received so far tell a different story.  Approximately 3% are Tier 1 claims, filed with proof of purchase.  The vast majority of claims—approximately 85%—are Tier 2 claims, seeking up to $10 in cash payments.  The final 12% of the claims are Tier 3 claims for coupons.  Keogh Response Decl., ¶ 2.

Even though each objector admits that he or she does not have any proof of purchasing Tyson RWA chicken, none of them acknowledges the significant challenge involved in successfully pursuing a case against Tyson without proof of purchase.  None of the objectors provides an estimate of actual damages he or she suffered, or attempts to explain how those damages could be proven on a class basis.  The objectors do not suggest any claim, theory or strategy that might have yielded a more favorable result for class members given the likelihood that most class members did not retain receipts.  None of the objectors has pointed to any authority suggesting the class attorneys overestimated the challenges associated with certifying a class or maintaining certification through trial.  If the class was certified for liability purposes, class members were given the opportunity to come forward with individual proof of damages, and Tyson was permitted to challenge their evidence, the proof requirements would be far more stringent than in this settlement, leaving many class members with no recovery at all.  The settlement before the Court gives every interested consumer the right to file an online claim, no questions asked, and not one of the 12,185 people who have already filed claims has objected

that the recovery is insufficient in relation to the value placed by that individual on his or her claim.

No objector articulates a reason why the negotiated recoveries are inadequate under the circumstances, including the fact that the claims asserted in this action are and continue to be disputed, have not been resolved in Plaintiffs' favor, and could ultimately be resolved against Plaintiffs if the litigation were to continue, resulting in no recovery for the class.  The settlement is just that—a settlement of disputed claims, for which there is no guarantee anything at all would have been recovered at trial.  *See, e.g., DeHoyos*, 240 F.R.D. at 309 ("Settlement, by its very nature, involves compromise by both sides on the relief afforded to the class after hard fought negotiations over contested issues of fact and law.").  "By settling, both sides gain the benefit of immediate resolution of the litigation and some measure of vindication of their respective positions but forego the opportunity to recover all potential losses or completely avoid liability."  *In re Western Union Money Transfer Litig.*, No. CV-01-0334 (CPS), 2004 WL 3709932, at *18 (E.D.N.Y. Oct. 19, 2004).

### 1. The Coupon Component of the Settlement Allows Class Members to Benefit Even Though They Have No Proof of Their Damages

There is a coupon component to the settlement, designed to provide some recovery to class members who do not have the evidence necessary to prove their claims at trial.  This is not, however, a typical "coupon settlement" in which the only form of relief is a discount on a future purchase of the defendants' products.  *See, e.g., In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 803 (3d Cir. 1995) ("the settlement involves only non-cash relief").  The current claims rate shows that 12% of class members are opting for the coupon, with the vast majority recovering cash.

Although only a small percentage of the recovery in this case will be in the form of coupons, it is still true that "a well-designed coupon settlement can provide class members with

more value than a cash settlement because the defendant is likely to be much more generous in its coupon offer." *In re Mexico Money Transfer Litig.,* 164 F. Supp. 2d 1002, 1018-1019 (N.D. Ill. 2000). The coupons that are distributed in this case will go to people who have "already demonstrated a likelihood of purchasing [Tyson products] with or without a coupon." *See Western Union,* 2004 WL 3709932, at *12. The coupons may be used to purchase any Tyson product. These products are widely available throughout the country. *See id.* The coupons will be immediately available upon issuance, which "reduces the risk that they will be misplaced or lost." *Id.* at 13. Moreover, a consumer who finds it inconvenient to visit a bank (or who does not have a bank account) may prefer to use a coupon at a store rather than receive a check.

Objector Sibley says that it is unclear whether or not the coupons are transferable. (Sibley at 3.) The answer is that they are transferable. This attribute increases their value because a class member who does not wish to use the coupon may sell or give it to another person. *See id.* ("the coupons are freely transferable and can be used at par value by any holder. As a result, even those [class members] who no longer use defendants' service will be able to sell their coupons or give them away."). Objector Sibley also objects to the coupons having an expiration date. (Sibley at 3.) The coupons do expire 90 days after they are issued. But it is not unusual for coupons to have an expiration date, particularly when they will be used for routine grocery purchases rather than an expensive or infrequent purchase that may never happen if the coupon expires too quickly. *See id.* ("[A] lengthy redemption window increases the likelihood that class members will use the coupons.").

Finally, the $5 coupon will likely cover a large portion, if not all, of a consumer's purchase. This is therefore not a case like *General Motors,* in which class members were given $1,000 coupons redeemable toward the purchase of a new truck and could not benefit from the coupon unless they paid the remainder of the purchase price to obtain any benefit from the coupon. 55 F.3d at 780, 808 (distinguishing cases in which coupons are valuable because they

"differ dramatically in the amount of money required to purchase the good—i.e., to realize the certificate's value—and in the frequency with which a typical consumer might expect to purchase the good").

### 2. The Donations to Food Banks Are the "Next Best Use" of Unclaimed Funds

The Weinstein objectors argue that funds remaining after all claimants are paid should be distributed to claimants rather than as in-kind donations to food banks. (Weinstein at 3-4.) Citing only the proposed final draft of the American Law Institute's Principles of the Law of Aggregate Litigation, the Weinstein objectors ignore that "[i]n practice, federal courts around the nation have ordered *cy pres* distributions in class action settlements, particularly when unclaimed funds remained." *In re Lease Oil Antitrust Litig. (No. II)*, No. MDL 1206, 2009 WL 5195977, at *8 (S.D. Tex. Dec. 22, 2009) (citing cases); *see also In re Pharmaceutical Industry Average Wholesale Price Litig.*, 588 F.3d 24, 35 (1st Cir. 2009) (rejecting objector's argument that funds remaining after payment of all claims should be distributed to class members instead of charities, and stating "[t]he question before us is not whether the settlement complies with the ALI [American Law Institute, Principles of the Law of Aggregate Litigation] draft, but whether the district court abused its discretion in approving the cy pres part of the settlement"); *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 436 (2d Cir. 2007) (finding that it was within court's discretion to distribute funds to charitable organizations after all claimants were paid); *In re Microsoft Corp. Antitrust Litig.*, 185 F. Supp. 2d 519, 523 (D. Md. 2002) ("[T]he cy pres approach is most frequently used for the purpose of distributing the residue of a class settlement fund").

The distribution of Tyson products to food banks is a "next best compensation use" of settlement funds that remain after all claims have been paid. 2 William B. Rubenstein, Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 10:17 (4th ed. 2009) ("The cy pres

approach … puts the unclaimed fund to its next best compensation use, e.g., for the aggregate, indirect, prospective benefit of the class …. In such an event, the funds are usually paid to a third party or agency to use for a designated purpose.")  "In a settlement context, subject to court approval, counsel for the parties have great flexibility in negotiating an agreement concerning how any unclaimed balance of an aggregate class recovery should be distributed."  Newberg § 10.15 ("[T]he cy pres … distributions serve the objectives of compensation for the class (albeit in an indirect manner), access to judicial relief for small claims, and deterrence of illegal behavior.").

While recognizing that "the cy pres donation is laudable," the Siegel/Cochran objectors question the selection of the food banks and how the donations will be valued.  (Siegel/Cochran at 7.)  These questions are easily answered.  Tyson will make donations exclusively through the Feeding America food bank program.  Feeding America has the largest network of food banks in the country, with at least one food bank in every state.  A list of the over two hundred food banks that participate in this program is located at http://feedingamerica.org/ foodbank-results.aspx?all=true.  Feeding America regularly receives donations from thousands of corporations for distribution of products, as needed, to local food banks.  Given that this is the mission and primary objective of the organization, Feeding America is uniquely situated to direct donations to appropriate food banks.  Tyson will work with Feeding America to ensure that food banks are equipped to handle the quantity of product delivered, and that food is distributed where there is a need.  Feeding America, working closely with Tyson, is infinitely better situated than the objectors to decide how to distribute Tyson product to food banks throughout the country.

The in-kind food bank distributions will be valued, as of the date of donation, by reference to EMI or the AC Nielsen Index, both of which are industry-wide recognized indices for valuing the productions in question.  "EMI" refers to data provided by Express Markets, Inc., a company that provides subscribers like Tyson with reliable data for the average price retailers

pay for raw chicken at a particular point in time.  EMI provides reliable data to the industry for the average price paid by retailers for raw chicken by auditing the invoices of wholesalers to confirm the accuracy of its reported data.

Because data from Tyson's subscription to EMI is available only for raw chicken, a different measurement is needed to value Tyson's donation of processed food products.  That measurement is the AC Nielsen Index, which provides average industry retail prices for processed chicken products.  This is why the Settlement Agreement notes that the value of donations will be determined by reference to EMI or the AC Nielsen Index "as appropriate for the products being donated."  Although EMI and AC Nielsen Index do not provide real-time reporting, which would be virtually impossible, they provide the most up-to-date, accurate and objective data available in the industry.

Finally, Tyson has requested a nine-month period during which to make the food bank donations because of the logistics associated with moving such a potentially large volume of food to the food banks where it is needed.  Tyson also reports that it needs flexibility in order to ensure that it has the supply of chicken, as well as the required shipping and transportation means, to meet the donation requirements in an orderly fashion.  Moreover, food banks typically do not maintain substantial storage such that they would be able to store such large amounts of food at one time.  It would be impractical to require Tyson to make donations over a shorter time period and in fact, such a requirement could lead to waste because certain food banks may not be able to handle such a large amount of product over a short period of time.

### B.      The Class Is Properly Defined

Objector Cox takes issue with the certification of the class for settlement purposes because he contends that the class definition is not "precise, objective and presently ascertainable."  (Cox at 2).  While this objection highlights one of the major challenges of the case—identifying class members when there is no accessible compilation of the names of all the

people who purchased Tyson RWA chicken—it misconstrues the objectivity requirement.[4]

Class members are defined as:

> All persons who purchased Tyson chicken or chicken products sold in the United States as either "Raised Without Antibiotics" and/or "Raised Without Antibiotics that impact antibiotic resistance in humans" between June 19, 2007 and April 30, 2009.

This definition is precise, objective and ascertainable because a person will either have purchased the Tyson RWA products or not.  "[S]imply because the objectors cannot identify each member of the class does not make the class unidentifiable. … An identifiable class exists if its members can be ascertained by reference to objective criteria." *DeHoyos*, 240 F.R.D. at 298-99 (citation omitted).

Although the class members could not be identified for the purpose of giving notice because the parties do not have easy access to information about who purchased Tyson RWA chicken, "[o]nce the potential class members report this information, the class is identifiable because its members can be ascertained by referring to objective criteria." *Id.* at 299.  In addition, the class period covers the entire time that the RWA products were sold, so there is no need for any Tyson purchaser to question whether his or her purchase occurred before June 19, 2007 or after April 30, 2009.  "[I]f potential class members have a question about whether they are members of the class, they can call or write the Settlement Administrator, or class counsel, or visit the website." *Id*.  "Because the class is identifiable, the objections to its definition, therefore, lack merit." *Id*.

C.     **The Scope of the Release Is Commensurate With the Claims Asserted**

In exchange for the benefits to class members, Tyson will be released from liability as follows:

---

[4] The section of the Manual for Complex Litigation and the cases Objector Cox cites address certification of litigation classes, not settlement.  (Cox at 2-3.)

> The Released Claims include any and all rights, duties, obligations, claims, actions, causes of action, or liabilities, whether arising under local, state, or federal law, whether by statute, contract, common law, or equity, whether known or unknown, suspected or unsuspected, asserted or unasserted, foreseen or unforeseen, actual or contingent, liquidated or unliquidated that, as of the date that the Final Judgment and Order is entered, arise out of or relate in any way to: (a) all claims that were or could have been asserted in the Litigation or the Underlying Actions; (b) all of the acts, omissions, facts, matters, transactions, or occurrences that were directly or indirectly alleged, asserted, described, set forth, or referred to in this Litigation or the Underlying Actions; or (c) any oral or written statements or representations, including but not limited to all forms of advertising and marketing, to Plaintiffs or the Settlement Class regarding Tyson's RWA or Qualified RWA claim.

*See* Ulwick Decl., Ex. 1 (Settlement Agreement) at ¶ 8.C (Dkt. No. 94).

The Weinstein objectors contend that the release is overbroad. (Weinstein at 2-3.) But it is well established that a release in a class action may include unpleaded claims that arise out of the same conduct alleged in the case. *See, e.g., Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 106 (2d Cir. 2005) (recognizing that "[b]road class action settlements are common, since defendants and their cohorts would otherwise face nearly limitless liability from related lawsuits in jurisdictions throughout the country," and the release may include "claims that share the same integral facts as settled claims, provided that the released claims are adequately represented prior to settlement"). The Weinstein objectors strain to read the release as including personal injury claims, despite the fact that there has been no suggestion from any quarter that consumption of RWA chicken was in any way injurious to any consumers' health. The Weinstein objectors' reading of the release is unreasonable as no claims for personal injury were, or could have been, asserted in this litigation. This is a false advertising case. *See National Super Spuds, Inc. v. New York Mercantile Exchange,* 660 F.2d 9, 18 (2d Cir. 1981) (rejecting settlement that released claims unrelated to the claims asserted in the underlying case and noting that a release "rests on its res judicata effect and is, therefore, limited to the claims alleged in the pleadings"); *cf. In re General American Life Ins. Co. Sales Practices Litig.,* 357 F.3d 800, 804

(8th Cir. 2004) (rejecting class member's objection based on scope of claims identified in notice and distinguishing *Super Spuds*); *Lipuma v. American Express Co.,* 406 F. Supp. 2d 1298, 1317-1318 (S.D. Fla. 2005) (rejecting argument that release was too broad on the grounds that, unlike the settlement in *Super Spuds,* the proposed settlement did not release claims that were unrelated to the claims litigated).

## V.   THE ATTORNEYS' FEE REQUEST IS REASONABLE

The objectors appear to assume that a $3 million fee request will confer a tremendous windfall on Class Counsel.  In fact, Class Counsel have requested a fee that has been reduced 35.27% from their lodestar at their standard rates.  The objections to this request reflect a basic misunderstanding of the circumstances surrounding the fee application, the procedural challenges in the case, and the cost of prosecuting the litigation.

### A.    The Negotiating Process Resulted in a Reasonable Fee

The objectors make two conflicting arguments about the way in which the fees were negotiated.  Some objectors contend that plaintiffs' failure to negotiate the substantive terms of the settlement and the attorneys' fees simultaneously "hurt the class."  (Weinstein at 2.)  Other objectors argue that the "clear-sailing" provision is evidence that the terms of the settlement and the fees *were* negotiated simultaneously, raising ethical concerns.  (Siegel/Cochran at 7-8; Sibley at 3-4; Cox at 5.)

These conflicting arguments illustrate the practical dilemma that plaintiffs and their counsel routinely face in negotiating class action settlements.  "[T]he defendant is entitled to know the limit of his total exposure, and, as the Supreme Court has recognized, it is unrealistic to expect him to agree to a settlement concerning the [substantive] terms until he knows the limit of his exposure for the attorney's fees."  *Malchman v. Davis*, 761 F.2d 893, 907 (2d Cir. 1985), *cert. denied*, 475 U.S. 1143 (1986), *abrogated on other grounds by Amchem Prods., Inc. v.*

*Windsor*, 521 U.S. 591 (1997).  But "[t]o avoid unfortunate appearances, fee agreements should not be discussed until the parties have agreed on the terms of the settlement."  Newberg § 15.34.

The solution is to postpone any discussion of attorneys' fees until the material terms of the settlement are finalized.  *See, e.g., In re Sony SXRD Rear Projection Television Class Action Litig.*, No. 06 Civ. 5173 (RPP), 2008 WL 1956267, at *15 (S.D.N.Y. May 1, 2008)  (negotiation of fees after agreement on substantive terms "tends to eliminate any danger of the amount of attorneys' fees affecting the amount of the class recovery").  That is how the parties proceeded with negotiations in this case.  *See* Plaintiffs' Joint Decl., ¶¶ 115-21 (Dkt. No. 104).  Plaintiffs could not have simultaneously negotiated the material settlement terms and attorneys' fees, as some objectors advocate, without creating at least the appearance of a conflict of interest.

The inclusion of a clear-sailing provision in the settlement agreement does not change the facts about how this settlement was reached.  Tyson—not Plaintiffs or their counsel—insisted that attorneys' fees be negotiated before this settlement was presented to the Court.  Clear-sailing provisions are fairly commonplace and courts recognize that "settlements are promoted by permitting the parties to a class action to negotiate a ceiling on the amount of attorney's fees that the plaintiffs will seek."  *Malchman*, 761 F.2d at 907.  "This practice serves to facilitate settlements and avoids a conflict, and yet it gives the defendant a predictable measure of exposure of total monetary liability for the judgment and fees in a case."  Newberg § 15:34. "Accordingly, courts are authorized to award attorneys' fees and expenses where all parties have agreed to the amount, subject to court approval, particularly where the amount is in addition and separate from the defendant's settlement with the class."  *DeHoyos*, 240 F.R.D. at 322; *see also Duhaime v. John Hancock Mut. Life Ins. Co.*, 989 F. Supp. 375, 379 (D. Mass. 1997) (approving "clear sailing" agreement where the attorneys' fee was negotiated at arms' length, did not diminish the relief available to the class, and was negotiated only after the other substantive terms of the settlement had been resolved).

**B.      A Lodestar Analysis Confirms That the Requested Fee Is Reasonable**

Plaintiffs have not asked the Court to approve their fee request without conducting its

own assessment of the reasonableness of the request.  At the preliminary approval hearing, the

Court said it intended to carefully scrutinize the fee request.  Class Counsel have provided the

Court with extensive information about the procedural history of the case, the work they

performed, and the procedural challenges that required Class Counsel to focus their work in

certain areas, such as how to prove damages on an aggregate basis.  *See* Plaintiffs' Joint Decl.

(Dkt. No. 104); *see also* Memo ISO Application for Fees at 7-10, 12-17 (Dkt. No. 102).  Class

Counsel also filed a Compendium of Class Counsel Declarations, which contains individual

declarations from each of the Class Counsel firms that briefly summarize the firm's role in the

case, identify the attorneys who were involved and their normal hourly rates, calculate the

lodestar value of the time expended by attorneys and paralegals, and attach detailed time

records.[5]  Compendium of Class Counsel Declarations (Dkt. No. 105).  Class Counsel have also

segregated their time into the litigation phases outlined in this Court's Rules and Guidelines for

Determining Attorneys' Fees (Local Rule, App. B), both on an aggregate and a per-firm basis.

Plaintiffs' Joint Decl., ¶ 137 (Dkt. No. 104); Compendium, Ex. A (Dkt. No. 105).

This record shows that there is no merit to the objectors' argument that Plaintiffs

expended minimal effort in prosecuting this case.  The Weinstein objectors say that liability was

---

[5] The Weinstein objectors argue that they should be entitled to review Counsel's detailed time records, which were lodged with the Court for *in camera* review only.  The balance of counsel's fee request was filed with the Court.  (Weinstein at 5.)  They have cited no authority to support their request, and other courts have rejected similar arguments by objectors.  *See, e.g., Lobatz v. U.S. West Cellular of California, Inc.*, 222 F.3d 1142, 1148 (9th Cir. 2000) ("The district court did not err in denying [the objector's] request for discovery of class counsel's contemporaneous time records."); *DeHoyos,* 240 F.R.D. at 336 ("Even presuming the class members could fully comprehend the detailed time records, this objection fails to explain how these individuals are qualified to pass judgment on the daily time records of attorneys in a complex, national class action.").  The request should be denied here too, particularly given the highly confidential nature of the records.  *See DeHoyos*, 240 F.R.D. at 336 (noting that the time records contain privileged information and attorney work product reflecting the mental impressions and strategies of counsel and "[t]he objectors have not shown how turning over these documents would not be detrimental to plaintiffs' interests").

already established, and the Siegel/Cochran objectors point to the short "time-line" of the case

based on their incorrect assumption that the case was filed in October 2008.  (Weinstein at 4;

Siegel/Cochran at 3.)  While this Court's preliminary injunction order in the *Sanderson Farms*

case went a long way toward establishing liability, the Court recognized that claims asserted in

this action are different, with different elements of proof.  Moreover, the preliminary injunction

order did not resolve the procedural hurdles of litigating the consumer case on a classwide basis.

Over the course of nearly two years—the first complaint was filed in April 2008—Class Counsel

invested 9,704 hours in an effort to overcome the challenges posed by, among other things,

choice of law considerations, proving causation and reliance on a classwide basis, identifying

class members, and proving damages on an aggregate basis.  The litigation was hard-fought, and

included substantial discovery of Tyson and third parties, extensive investigation and

consultation with experts, voluminous document productions and thorough preparation for class

certification.

    The objectors contend that the fee is too high based on a percentage-of-the-fund analysis.

(Siegel/Cochran at 3; Weinstein at 5; Needham-Ward at 4-5; Sibley at 3-4; Cox at 5.)  But the

class relief and attorneys' fees are not a common fund, and the appropriate analysis in this case is

based on Class Counsel's lodestar.  *See, e.g., Jones v. Dominion Resources Services, Inc.*, 601 F.

Supp. 2d 756, 760 (S.D. W. Va. 2009) (the court has "complete discretion 'to determine the

appropriate method for calculating attorneys' fees in light of the unique characteristics of class

actions in general, and the particular circumstances of the [instant matter].'") (citation omitted);

*Weber v. Gov't Employees Ins. Co.*, 262 F.R.D. 431, 449 (D.N.J. 2009) (applying lodestar

method where settlement did "not contemplate a common fund that would be depleted depending

upon the size of the fee award"); *Pelletz v. Weyerhaeuser Co.*, 592 F. Supp. 2d 1322, 1325-26

(W.D. Wash. 2009) ("[B]ecause the attorneys' fees will be assessed against the Defendants

without reducing the relief available to the Class, the lodestar method is more appropriate.").

Application of the factors relevant to the lodestar analysis confirms the reasonableness of Class Counsel's requested fee. *See, e.g., Robinson v. Equifax Information Servs., LLC*, 560 F.3d 235, 243-44 (4th Cir. 2009). Extensive time and labor was required to address the procedural challenges of certifying a nationwide consumer class. The case was demanding and risky to litigate given these procedural issues. Counsel drew on their experience in litigating other complex cases and prosecuting nationwide consumer class actions.[6] They took on the burden of the contingent fee arrangement and advanced substantial litigation expenses. Plaintiffs secured a settlement that allows any consumer to make a claim notwithstanding the fact that very few consumers would recover anything in a contested damages proceeding.

In determining an appropriate fee, courts have multiplied normal hourly rates by factors of between two and four times the actual hourly rates, particularly in cases involving consumer protection claims. *See, e.g., In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 341 (3d Cir. 1998); *In re NTL Inc. Sec. Litig.*, Master File No. 02 CIV 3013(LAK), 2007 WL 1294377, at *8 (S.D.N.Y. May 2, 2007) ("In the 'usual' case, the multiplier applied to the lodestar typically is positive, to account for the contingent nature of the engagement and the risk of such a case"); *Jones*, 601 F. Supp. 2d at 766 ("Courts have generally

---

[6] While Class Counsel believed settlement in advance of a ruling on certification was consistent with the best interests of the class in this matter, the attorneys representing the class in this matter have obtained orders certifying nationwide classes in other sharply contested cases. *See, e.g., In re Mercedes-Benz Tele Aid Contract Litig.*, MDL No. 1914, 2010 WL 931865 (D.N.J. Mar. 15, 2010) (nationwide class of Mercedes purchasers asserting claims under New Jersey consumer protection law); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, -- F.R.D. --, 2010 WL 1417896 (N.D. Cal. March 28, 2010) (liaison counsel for nationwide class of purchasers of LCD panels asserting antitrust claims); *Parkinson v. Hyundai Motor America*, 258 F.R.D. 580 (C.D. Cal. 2008) (nationwide class of Hyundai purchasers asserting claims under California consumer protection statutes); *Odom v. Microsoft, et al.*, Case No. 04-2-10618-4-SEA (Wash. Sup. Ct., King Cty. April 4, 2007) (Dkt. No. 364) (nationwide class asserting claims under Washington consumer protection statute); *Lund v. AT&T Corp.*, Case No. C 98-1500-DDP (C.D. Cal. Oct. 15, 1998) (Dkt. No.151) (nationwide class under telecommunications laws); *In re American Honda Motor Co., Inc. Dealers Relations Litig.*, 979 F. Supp. 365 (D. Md. 1997) (nationwide class of automobile dealers against manufacturer and other dealers alleging RICO and related common law claims). Given counsel's experience in litigation under Fed. R. Civ. P. 23, their conclusion that certification in this matter presented challenges which justified settling on the terms proposed should be given considerable weight.

held that [lodestar] multipliers falling between 2 and 4.5 demonstrate a reasonable attorneys' fee."). In this case, Class Counsel have requested only a portion of their lodestar.

Class Counsel request a fee of $2,820,268. This requested fee is 35.27% less than Counsel's total lodestar at their standard rates, which is $4,356,748. The requested fee is also 15.84% less than their lodestar at Maryland rates, calculated using Kramon & Graham's standard rates, which is $3,350,991. Other courts have observed that a fee request that is lower than counsel's lodestar poses no danger of overcompensation and is evidence of the reasonableness of the request. *See, e.g., In re Initial Public Offering Sec. Litig.*, 671 F. Supp. 2d 467, 515 (S.D.N.Y. 2009); *Vista Healthplan, Inc. v. Warner Holdings Co. III, Ltd.*, 246 F.R.D. 349, 364-65 (D.D.C. 2007).

Rather than address the application of the lodestar analysis to the information Class Counsel have provided about their work in this case, the objectors argue, without citing any cases, that the requested fee ($2,820,268) represents a disproportionate amount of the total amount that Tyson has agreed to pay ($8,000,000). (Siegel/Cochran at 3; Weinstein at 5; Needham-Ward at 4-5; Sibley at 4; Cox at 5.) But a fee of 35% of the total settlement amount is in line with awards by other courts. *See, e.g., Yarrington*, 2010 WL 1006518, at *3 ("In the Eighth Circuit, courts have routinely awarded attorney fees ranging from 25% to 36% of a common fund under the percentage-of-the-fund method."); *Jefferson v. Chase Home Finance*, No. C-06-6510 TEH, 2009 WL 2051424, at *3 (N.D. Cal. July 10, 2009) (awarding fee of 8.8 times the total class recovery because "state courts are clear in explaining that consumer protection may require precisely the outcome that Defendant challenges of a disproportionate award"); *Wells v. Allstate Ins. Co.*, 557 F. Supp. 2d 1, 7-8 (D.D.C. 2008) (awarding 45% fee in a class action brought under consumer protection statute); *In re Computron Software, Inc.*, 6 F. Supp. 2d 313, 322-23 (D.N.J. 1998) ("Awards utilizing the percentage-of-recovery method can reasonably range from nineteen percent to forty-five percent of a settlement fund").

21

Finally, Objectors Cox and Sibley purport to reserve their right to object to the fee award "at a later date."  (Sibley at 4; Cox at 5.)  They should not be permitted to assert any further objections because the application for the fee award and supporting information were filed on April 9, ten days before the deadline to object.

### C.   There Is No Reason to Delay Payment of Attorneys' Fees

Some of the objectors argue that payment of attorneys' fees should be delayed because this is a "coupon settlement" and its value cannot be determined until the coupons are redeemed. (Siegel/Cochran at 4-6; Needham-Ward at 3-4.)  But only a small portion of the settlement involves coupons—12% of the class members as of April 29—with the remaining class members receiving cash payments.  Keogh Response Decl., ¶ 2.   By contrast, in all of the cases the objectors cite, the only relief class members received was vouchers for future purchases of the defendant's products.  The courts struggled to assign a value to the settlement so that they could award the attorneys a percentage of the recovery in fees.  *See, e.g., In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 370 F. Supp. 2d 320, 321 (D. Me. 2005) (class members received vouchers toward the purchase of a new CD); *In re Excess Value Ins. Coverage Litig.*, 598 F. Supp. 2d 380, 381 (S.D.N.Y. 2005) (class members received vouchers to be used for the purchase of UPS products); *Yeagley v. Wells Fargo & Co.*, No. C 05-3403 CRB, 2008 WL 171083, at *2 (N.D. Cal. Jan. 18, 2008) (class members received a brochure about credit reports and two free credit reports).

In *Yeagley*, for example, the court noted that the relief provided to class members was already available to them and therefore "[t]he question presented is what is a reasonable attorney's fee for a virtually worthless settlement of a meritless case." 2008 WL 171083, at *1. Despite its statement that the settlement was "worthless," the court assigned minimal values to the brochures ($500,000) and free credit reports ($542,500) and then awarded class counsel 25% of the total "fund." *Id.* at *6-7.  The Ninth Circuit recently reversed and remanded, directing the

district court to use the lodestar method to recalculate a reasonable attorneys' fee.  No. 08-15378, 2010 WL 601460, at *1 (9th Cir. Feb. 22, 2010).

Because lodestar is the appropriate analysis in this case as well, there is no reason to delay the analysis or the payment of fees.  "Under the lodestar analysis, Class Counsel are not required to establish the exact total value of the settlement relief to justify payment of the fee before the close of the claims period. All that is required is a showing that the requested fee is reasonable."  *Grays Harbor Adventist Christian School v. Carrier Corp.*, No. 05-05437 RBL, 2008 WL 1901988, at *4 (W.D. Wash. Apr. 24, 2008); *see also Browning v. YahooA, Inc.*, No. C04-01463 HRL, 2007 WL 4105971, at *14 (N.D. Cal. Nov. 16, 2007) (applying a lodestar analysis with percentage-of-the-fund cross-check and rejecting argument by objectors, including an objector represented by Mr. Siegel, that attorney's fees should be based on "actual redemption rates").  The objectors' request for delay should be denied.

## VI.   THE INCENTIVE PAYMENTS ARE APPROPRIATE

The objections to the $2,500 incentive payments should be overruled.  "Incentive awards are fairly typical in class action cases." *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 958 (9th Cir. Cal. 2009).  They are intended to compensate class members who step forward to serve as named plaintiffs for the time and risk they incur in bringing a lawsuit.  "Small incentive awards, which serve as premiums to any claims-based recovery from the Settlement, promote the public policy of encouraging individuals to undertake the responsibility of representative lawsuits." *Yarrington*, 2010 WL 1006518, at *11 (finding a service award of $5,000 to each named plaintiff was reasonable and "at the modest end of the spectrum"); *see also Jones*, 601 F. Supp. 2d at 767-68 (S.D. W. Va. 2009) ("Incentive awards are routinely approved in class actions to 'encourage socially beneficial litigation by compensating named plaintiffs for their expenses on travel and other incidental costs, as well as their personal time spent advancing the litigation on behalf of the class and for any personal risk they undertook.'") (quotation omitted).

23

Plaintiffs have requested incentive payments of $2,500 for the four plaintiffs who were named in the consolidated complaint (Lisa Baxley, Mary Wilson, Andrea Dannell Johnson, and Mary Cutsail). The named plaintiffs produced documents (including proof of their purchases of Tyson RWA chicken), responded to written discovery, were deposed, and generally contributed to the success of the litigation on behalf of the class. *See* Plaintiffs' Joint Decl., ¶ 134 (Dkt. No. 104). Plaintiffs also seek incentive payments of $2,500 for the four class members who were named as plaintiffs in some of the cases transferred as part of the MDL and who also produced documents (including proof of their purchases of Tyson RWA chicken), responded to written discovery and were deposed (Karenlee Anderson-Smith, Michele Rehkop, Marcia A. Kranish, and June Johnson).

The requested $2,500 incentive payments are modest considering the time and effort that these eight class members undertook on behalf of the rest of the class, and are well in line with incentive awards approved by district courts in this Circuit. *See Hoffman v. First Student, Inc.*, No. WDQ-06-1882, 2010 WL 1176641, at *3 (D. Md. Mar. 23, 2010) (approving incentive awards of $3,000 each); *Wells*, 557 F. Supp. 2d at 9 (approving incentive awards of $10,000 each); *Jones*, 601 F. Supp. 2d at 758 (approving incentive awards of $15,000 each); *Smith v. Krispy Kreme Doughnut Corp.*, No. 1:05CV00187, 2007 WL 119157, at *4 (M.D.N.C. Jan. 10, 2007) (approving incentive awards of $15,000 each).

Objectors Cox and Sibley contend that the incentive awards create a conflict between the named plaintiffs and the class. (Cox at 5; Sibley at 3.) Courts routinely approve incentive awards and reject arguments that the awards create a conflict. *See, e.g., Western Union*, 2004 WL 3709932, at *17 (rejecting objectors' argument that awarding named plaintiffs $3,000 each created a conflict of interest with class members who received only coupons). Moreover, "by negotiating the general terms of the settlement before negotiating the awards to the named

24

plaintiffs, the incentives of the named plaintiffs were never counter to those of the class as a whole." *McBean v. City of New York*, 233 F.R.D. 377, 391 (S.D.N.Y. 2006).

The cases Objector Needham-Ward cites involve facts very different from this case. In *Rodriguez v. West Publishing Corp.*, some of the named plaintiffs entered into agreements at the beginning of the litigation that "tied the promised request to the ultimate recovery." 563 F.3d at 958-59 (although "[i]ncentive *awards* are fairly typical in class action cases, … [t]he incentive *agreements* entered into as part of the initial retention of counsel in this case … put class counsel and the contracting class representatives into a conflict position from day one"). No such agreements exist in this case. In *Staton v. Boeing Co.*, the Ninth Circuit recognized that incentive awards of $5,000 may be appropriate, but found that "concerns about incentive or risk payments to certain class members are exacerbated in this case" because the 29 class representatives were to receive payments totaling $890,000, even though some of them may not have been members of the class. 327 F.3d 938, 975-78 (9th Cir. 2003). Finally, in *Flinn v. FMC Group*, former named plaintiffs objected to the individual amounts they were to receive as part of the overall settlement, appealed the final approval order and judgment, and nonetheless sought payment of incentive awards. 528 F.2d 1169, 1176 (4th Cir. 1975) (finding that the appellants "disclaimed any right to a preferred position in the settlement"). All of the named plaintiffs in this case have supported the case throughout the litigation and support the settlement.

## VII.   CONCLUSION

Plaintiffs request that the Court approve the settlement, fee award and incentive payments, and enter the revised proposed final judgment submitted herewith.

Dated:  April 30, 2010                    Respectfully submitted,

   /s/ *James P. Ulwick*
James P. Ulwick
KRAMON & GRAHAM, P.A.
One South Street, Suite 2600
Baltimore, Maryland 21202
Telephone:  (410) 752-6030
Facsimile:  (410) 539-1269

Daniel C. Girard
A. J. De Bartolomeo
Amanda M. Steiner
Christina H.C. Sharp
GIRARD GIBBS LLP
601 California Street, Suite 1400
San Francisco, California 94108
Telephone:  (415) 981-4800
Facsimile:  (415) 981-4846

Scott E. Poynter
Chris D. Jennings
Gina M. Dougherty
EMERSON POYNTER LLP
The Museum Center
500 President Clinton Avenue, Suite 305
Little Rock, Arkansas 72201
Telephone:  (501) 907-2555
Facsimile:  (501) 907-2556

Richard S. Lewis
James J. Pizzirusso
HAUSFELD, LLP
1700 K St., NW, Suite 650
Washington, DC 20006
Telephone:  (202) 540-7200
Facsimile:  (202) 540-7201

Gary Friedman
Tracey Kitzman
FRIEDMAN LAW GROUP LLP
270 Lafayette Street, 14th Floor
New York, New York 10012
Telephone:  (212) 680-5150
Facsimile:  (646) 277-1151

*Class Counsel*

26